UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TIARA N. BARBER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:12-CV-976-JAR-NAB ) |
| CAROLYN W. COLVIN[1], Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Tiara Barber's ("Barber") application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 1381. Barber alleges disability due to a learning disability. (Tr. 187.) This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a Report and Recommendation. [Doc. 4.]

**I.    Procedural Background**

On July 28, 2009, Barber completed an application for SSI. (Tr. 128-130.) The Social Security Administration ("SSA") denied Barber's claim and she filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. 66-71.) The SSA granted Barber's request and the hearing took place on May 27, 2010. (Tr. 23-63, 73-74.) The ALJ issued a written decision on September 12, 2010, upholding the denial of benefits. (Tr. 10-19.) Barber requested review

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

of the ALJ's decision from the Appeals Council. (Tr. 123-127.) On March 28, 2012, the Appeals Council denied Barber's request for review. (Tr. 1-4.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Barber filed this appeal on May 30, 2012. [Doc. 1.] The Commissioner filed an Answer. [Doc. 9.] Barber filed a Brief in Support of the Complaint. [Doc. 15.] The Commissioner filed a Brief in Support of the Answer. [Doc. 20.] Barber filed a Reply Brief in Support of the Complaint. [Doc. 21.]

## II.     ALJ's Decision

The ALJ found that Barber had not engaged in substantial gainful activity since July 17, 2009, the application date. (Tr. 12.) The ALJ also found that the claimant had the combined severe impairments of depressive disorder and borderline intellectual functioning. (Tr. 12.) He found that the claimant did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) The ALJ determined that Barber's impairments preclude understanding, remembering, and carrying out more than simple instructions and detailed tasks. (Tr. 13.) The ALJ also determined that Barber can perform work at a normal pace without production quotas and maintain the concentration and attention required to work for two-hour segments over an eight-hour period. (Tr. 13.) The ALJ found that Barber has no past relevant work, but considering her age, education, work experience, and residual functional capacity ("RFC") there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 17-18.) The ALJ concluded that Barber has not been under a disability, as defined in the Social Security Act, since July 17, 2009, the date the application was filed. (Tr. 19.)

Barber alleges that the ALJ's decision should be reversed because the ALJ failed to (1) evaluate Barber's mental impairments and resulting functional limitations as required by 20 C.F.R. § 416.920(a), (2) consider whether Barber's condition was medically equivalent to Listing 12.05(C), and (3) include the marked limitations given by Dr. Littleton when establishing Barber's RFC or support the RFC with substantial evidence. The Commissioner contends that the ALJ's decision is supported by substantial evidence in the record as a whole and should be affirmed.

### III. Administrative Record

The following is a summary of relevant evidence before the ALJ:

#### A. Hearing Testimony

During the administrative hearing, the ALJ heard testimony from Barber and Vocational Expert Delores Gonzalez.[2] (Tr. 23-63.) Barber was represented by counsel.

##### 1. Barber's Testimony

Barber provided the following testimony. Barber was 21 years old at the time of the hearing. (Tr. 29.) She completed high school and took math, social studies, science, and English outside the regular classroom. (Tr. 30.) Barber enjoys reading, can perform simple math, make change at the grocery store, and write notes, letters, and Christmas cards. (Tr. 31-32.) Barber testified that she can use the computer to check her email and social networks such as Facebook. (Tr. 32-33.) Barber uses the computer to access Facebook and write status updates, check her inbox, and communicate with a couple of former classmates. (Tr. 33.)

Barber testified that she worked at a daycare for about a month in 2007. (Tr. 34-35.) At the daycare she would take the children outside, wash dishes, and clean the daycare. (Tr. 35.) It was the only job she has ever had. (Tr. 35.) The daycare called her when they needed her, but

---
[2] The undersigned notes that the correct spelling is Delores, although transcribed in the record as "Dolores."

"they" never called her back. (Tr. 35.) Barber testified that she has not tried to do any cooking jobs, but she has filled out applications to do so. (Tr. 36.) Barber likes to go to the movies but hasn't been in years. (Tr. 41.) She plays card games such as spades. (Tr. 41-42.) She testified that she does not and has never smoked or used alcohol or illegal drugs. (Tr. 43-44.)

Barber currently receives food stamps, temporary aid to needy families ("TANF"), and Medicaid. (Tr. 36-37.) She lives with her 19 month old daughter who attends daycare because Barber plans to return to school for general studies in English and English lab, so that she can continue to receive TANF. (Tr. 38-39.) Barber testified that the daycare transports her daughter to daycare and Barber will ride the bus to attend school. (Tr. 39-40.) She takes public transportation anywhere she needs to go including the mall, the library, relatives' homes, and school. (Tr. 43.) Barber has never had a driver's license and does not know how to drive. (Tr. 44.) Barber testified that she usually microwaves food for herself and her child and she washes dishes. (Tr. 44.) She does not know how to cook. (Tr. 44.) Other people usually accompany her to the grocery store to help her pick out food to buy for her daughter. (Tr. 45.) Other individuals are supposed to help her cook, but they never come. (Tr. 45.)

Barber previously dropped out of college because her daughter was constantly sick, the daycare was not taking care of her daughter, and she was staying with two different friends at the time. (Tr. 51-52.) Barber attended classes for office administration in which she received a certificate so she could continue receiving TANF. (Tr. 49.) Parents Learning Together comes to take her to the grocery store and sit and talk with her. (Tr. 49-50.) First Steps comes to work with her daughter and a social worker comes to see her and her daughter. (Tr. 50.)

Barber testified that she has been diagnosed with depressive disorder and has been taking Cymbalta for it since December 2009. (Tr. 37-38.) Barber's Lithium prescription was

discontinued because "they" found out she was not bipolar. (Tr. 42.) Barber does not know why she is disabled, because "they all said that." (Tr. 45.) Barber testified that her attitude problem would keep her from doing some jobs because she has mood swings that her medication does not help. (Tr. 46.) She stated that she gets into arguments with everyone and she can become violent if they put their hands on her. (Tr. 47-48.) Barber testified that she probably would have chosen part time work over full time work, because she does not feel like a full time shift. (Tr. 53.) Barber testified that she has trouble understanding and remembering things. (Tr. 51.)

### 2. Testimony of Vocational Expert Delores Gonzalez

VE Gonzalez testified as follows. Barber's former position at the daycare was not long enough to have developed any skills, therefore, there is no work history. (Tr. 57.) A hypothetical individual of the claimant's education, training, and work experience, assuming the individual can understand, remember, and carry out at least simple instructions, non-detailed tasks; demonstrate adequate judgment to make simple, work-related decisions; adapt to routine simple work changes; perform repetitive work according to set procedure, sequence, and pace; with no exertional limitations or other limitations would be able to perform work as a stuffer and ampoule sealer. (Tr. 57-58.) A stuffer is an unskilled sedentary position with 357,480 positions nationally, 10,850 in Missouri, and 3,960 in St. Louis. (Tr. 58.) An ampoule sealer is classified as sedentary and unskilled work with 827,470 positions nationally, 16,130 in Missouri, and 5,890 in St. Louis. (Tr. 58.)

Gonzalez testified that a second hypothetical individual who has no exertional limitations, but has the following mental limitations: understand, remember, and carry out simple instructions, non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; and can perform work at a normal pace without production quotas would be

unable to perform the stuffer or ampoule sealer jobs. (Tr. 58.) The second hypothetical individual could perform the position of surveillance system monitor, which is classified as sedentary and unskilled with 850,440 positions nationally, 2,020 in Missouri, and 700 in St. Louis. (Tr. 58-59.) The individual could also perform work as a ticket taker, which is classified as light and unskilled with 106,570 positions nationally, 2,930 in Missouri, and 1,620 in St. Louis. (Tr. 59.)

A third hypothetical individual with the same limitations as indicated in the second hypothetical who was unable to maintain concentration and attention in two hour segments over an eight hour period and would need to be refocused by the supervisor on job tasks daily would not be able to maintain competitive employment. (Tr. 59.) The VE testified that a marked deficiency in comprehension would affect semi-skilled and skilled jobs, and it would affect unskilled jobs if the person was required to read written instructions, possibly, or if the tasks changed frequently, or if the person was required to stay in one position for a long time and concentrate. (Tr. 60-61.) The VE also opined that an individual who was markedly deficient in comprehension, vocabulary, and visual alertness would not be able to work competitively. (Tr. 61.)

### B. Medical Evidence

On July 3, 2007, Case Manager Amy Hall of MERS/Goodwill performed a Comprehensive Transition Assessment Report of Barber evaluating her work ability. (Tr. 321-325.) At the time of the assessment, Barber was a recent high school graduate with a reported full scale intelligence quotient ("FSIQ") of 62. (Tr. 321.) Hall found that Barber demonstrated vocational strengths in some areas of competitive employment and inappropriate behaviors in negative attitude, poor communications skills, and attendance and punctuality problems.

Nevertheless, Hall concluded that Barber displayed skills necessary to obtain and maintain employment and cautiously recommended job development. (Tr. 322.) Hall recommended that Barber pursue part-time or full-time competitive employment in the fields of retail, kitchen, and daycare including but not limited to the following: dressing room attendant, straightening and returns, processing/stocking, sales floor (not cashier), banquet set-up, kitchen prep-work (not fast food), serving, dietary (hospital/nursing home), or day care assistant. (Tr. 322-323.) Hall also recommended that Barber receive support upon obtaining employment in the form of job coaching or support case management. (Tr. 323.) Hall noted that Barber may benefit from support in the areas of orientation, completing new-hire paperwork, training, and general support and encouragement such as working with co-workers, supervisors, managers, communication, and work behaviors. (Tr. 323.)

On January 2, 2009, Eric May evaluated Barber at Hopewell Center. (Tr. 260-264.) Barber reported difficulty with depression, discomfort, unpleasant ideations, and agitation. (Tr. 260.) Barber also reported occasional perceptual disorder with hearing voices, which she stated became noticeable six years prior. (Tr. 260.) May diagnosed Barber with Bipolar I Disorder, Most Recent Episode Mixed Unspecified and assessed her Global Assessment Functioning Score[3] as 45, which indicates serious symptoms or any serious impairment in social, occupational, or school functioning. (Tr. 264.)

On February 9, 2009, Barber was admitted to the Metropolitan St. Louis Psychiatric Center. (Tr. 273-287.) At the time of admission, Barber's stepmother Laurie Valentine reported that Barber had been depressed, which was exacerbated by the birth of Barber's daughter. (Tr. 277.) Ms. Valentine stated that Barber had been lighting matches near the baby stating she

---

[3] Global Assessment Functioning is a "clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").

7

wanted her to shut up and threatened to kill the baby's father and herself. (Tr. 277.) Barber reported that she has been hearing voices call her name and that her father had been causing her problems since she moved in with him. (Tr. 277-278.) Barber denied suicidal or homicidal ideation, but the thought had crossed her mind to kill her dad, because he disrespected her. (Tr. 279.) Drs. Donald Bohenkamp and Devna Rastogi diagnosed Barber with depression not otherwise specified and assessed her GAF as 35. (Tr. 280.) The hospital discharged Barber to her home on February 13, 2009 with a diagnosis of depression not otherwise specified and a GAF of 55. (Tr. 275.) Drs. Bohenkamp and Rastogi provided Barber with a supply of Cymbalta, set up a psychiatrist appointment, and referred her to Nurses for Newborns for parenting issues. (Tr. 275.)

Barber met with Dr. Rolf Krojanker at Hopewell Center March and April 2009. (Tr. 294-295.) At the April 2009 visit, Dr. Krojanker noted that Barber was in a hypomanic state and Barber reported that she is not depressed and she needed only three and a half hours of sleep. (Tr. 295.) On March 31, 2009, Dr. Arthur Littleton, a psychologist, examined Barber for a disability determination. (Tr. 290-292.) Dr. Littleton administered the Wechsler Adult Intelligence Scale- Third Edition[4] ("WAIS-III"). (Tr. 291.) Barber scored a Verbal I.Q. score of 75 and a Performance IQ score of 78 with a FSIQ of 75.[5] (Tr. 291.) Barber's score placed her in the borderline mentally defective intellectual classification. (Tr. 291.) Barber demonstrated strength in short term memory and psychometer speed, but was markedly deficient in comprehension, vocabulary, and visual alertness to details. (Tr. 291.) Littleton opined that

---

[4] "The WAIC–III measures general intellectual functioning. The Full Scale IQ provides a measure of general intelligence. The Verbal IQ provides a measure of verbal comprehension, including the application of verbal skills and information to the solution of new problems, ability to process verbal information, and the ability to think with words. The Performance IQ provides a measure of perceptual organization, including the ability to think in visual images and to manipulate these images with fluency and relative speed, to reason without the use of words and to interpret visual material quickly" *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 820 n.1 (8th Cir. 2008).
[5] Borderline intellectual functioning is indicated in an IQ score in the 71-84 range. DSM-IV-TR 740.

Barber demonstrated significant limitation in comprehension and word meanings. (Tr. 292.) Dr. Littleton diagnosed Barber with depressive disorder and borderline intellectual functioning with a GAF of 50. (Tr. 292.)

On September 15, 2009, Dr. Kyle DeVore, psychologist, completed a Psychiatric Review Technique and Mental RFC Assessment for Barber. (Tr. 296-310.) Dr. DeVore opined that Barber had borderline intellectual functioning and depressive disorder, not otherwise specified. (Tr. 297, 299.) Dr. DeVore found that she was mildly limited in the activities of daily living and moderately limited in maintaining concentration, persistence, or pace and had one or two repeated episodes of decompensation of extended duration. (Tr. 304.) Dr. DeVore determined that Barber was moderately limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (Tr. 308-309). Dr. DeVore opined that Barber's IQ scores were valid and she was capable of remembering, understanding, performing simple 1-2 step tasks. (Tr. 306, 310.)

Thelma Coleman, MSW, Raehana Pradhan, MSW, and Dr. Krojanker at Hopewell prepared a Pyschosocial/Clinical assessment for Barber on November 12, 2009. (Tr. 328-334.) Barber reported that she was preoccupied with injustices or unrealistic fears since she was a child and that she has always had an attitude problem. (Tr. 332.) The assessment indicated that Barber functional strengths included good counseling skills and her functional deficits included partial compliance with treatment of her mental illness and acceptance of her mental illness was below average. (Tr. 332.) The assessment also noted that Barber had a history of anger problems bordering on violence and that communication or efforts to resolve problems lead to

denial, confusion, mood swings, frustration, conflict, aggression, or threats. (Tr. 332.) Barber received a diagnosis of bipolar affective disorder and a GAF of 30. (Tr. 333.)

C. **School Records**

When Barber was thirteen in 2001, her father requested that she be formally evaluated to determine appropriate placement in school. (Tr. 205.) Several evaluations were done including the Weschler Intelligence Scale for Children- Third Edition. (Tr. 206-227.) Barber scored within the intellectually deficient/mentally retarded range of cognitive functioning (69 and below), with a verbal IQ of 67, a Performance IQ of 63, and a FSIQ of 62 on the WISC-III for Children. (Tr. 206.) Barber's strengths were similarities and picture completion and her weaknesses were object assembly, information, vocabulary, and coding. (Tr. 207.) Barber was then placed in special education classes. (Tr. 226.)

In 2007, Barber received her last individualized education plan ("IEP") in the twelfth grade. (Tr. 157-175.) The IEP indicated that evaluations in 2001 and 2004 determined that Barber's cognitive and intellectual functioning remained in the intellectually deficient range of cognitive ability, which is considered mentally retarded. (Tr. 157.) Prior to 2007, Barber functioned below grade level and was weak in basic reading and math skills. (Tr. 158.) She had passed the majority of her classes with average grades putting forth great effort. (Tr. 158.) The 2007 IEP indicated that Barber's diagnosis of mental retardation continued to be appropriate and she was placed inside regular classes at least 80% of the time. (Tr. 161-162.) Barber passed all of her classes in high school, although marginally with a "D" or better. (Tr. 164.) The 2007 IEP also noted that Barber maintained good attendance, displayed acceptable social/emotional/behavioral skills and got along well with peers. (Tr. 164.) It was also noted that she can be obstinate and uncooperative with some teachers, but she is generally not

disruptive. (Tr. 164.) Barber and her father indicated Barber wanted to graduate from high school and attend college. (Tr. 164.)

### D. Adult Function Report

Barber completed an Adult Function Report with her social security application. (Tr. 193-200.) Barber indicated that she was able to take care of her personal needs and that she took care of her daughter by feeding, washing, and changing her, as well as playing with her. (Tr. 193-194.) Barber indicated that she did not know how to cook, but she could clean the bathroom and kitchen and iron, but it takes her "a minute to get it all done." (Tr. 195.) Barber wrote that she goes shopping and it takes her hours to shop. (Tr. 196.) Barber stated that she like to have fun, walk, talk, and go to the movies, but does not do any of those things on a regular basis. (Tr. 197.) Barber indicated that she does not get along with her family, friends, and others. She indicated that her disability affects her understanding, following instructions, memory, getting along with others, completing tasks, and concentration. (Tr. 198.) Barber indicated that she can pay attention for "long," and follow spoken instructions "enough," but she needs some help with following written instructions. (Tr. 198.) She noted that she did not handle stress well, but was "fair" in handling changes in routine. (Tr. 199.)

## IV. Legal Standard

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. § 416.920(a). First, the

claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 416.920(a). Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 416.920(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 416.920(d). Fourth, the claimant must establish that the impairments prevents him or her from doing past relevant work. 20 C.F.R. § 416.920(e). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 416.920(a)(4)(v).

The district court does not reweigh the evidence or review the factual record de novo. *Id.* This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Id.* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997.)

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

    1. The findings of credibility made by the ALJ;

2. The education, background, work history, and age of the claimant;

3. The medical evidence given by the claimant's treating physicians';

4. The subjective complaints of pain and description of the claimant's physical activity and impairment;

5. The corroboration by third parties of the claimant's physical impairment;

6. The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

7. The testimony of consulting physicians

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

**V. Discussion**

Barber asserts three errors on appeal, but the undersigned will only address Plaintiff's second issue on appeal as it is dispositive. Barber asserts that the ALJ failed to consider whether Barber's condition was medically equivalent to Listing 12.05(C). The Commissioner asserts that it is Barber's burden to prove that she meets or equals a listing and she has not shown the adaptive functioning needed to meet or equal a listing.

If a mental impairment is severe, the Commissioner must determine if it meets or is equivalent in severity to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). An individual may be considered for mental retardation under Listing 12.05 at step three of the evaluation process. *Phillips v. Colvin*, No. 12-3265, 2013 WL 3822089 at *6 (8th Cir. July 25, 2013). "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period , i.e., the evidence demonstrates or supports onset of the impairment before age 22. 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.05. Listing 12.05 requires the complainant to show either (1) mental incapacity evidenced by dependence on others for personal needs and inability to follow directions; (2) a valid verbal, performance, or FSIQ of 59 or less; (3) a valid verbal, performance or FSIQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function, or (4) a valid verbal, performance, or FSIQ of 60 through 70 resulting in at least two of the following: marked restriction in activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. *Id.*

An impairment is medically equivalent to a listed impairment contained in appendix 1, if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a). If a claimant has a combination of impairments, neither of which meets a listing, the Commissioner is required to compare the claimant's findings with those for closely analogous listed impairments. 20 C.F.R. § 416.926(b)(3). If the findings related to the impairments are at least of equal medical significance to those of a listed impairment, the Commissioner will find that the impairment or impairments are medically equivalent to that listing. 20 C.F.R. § 416.926(b)(3). In determining medical equivalence, all of the evidence in the case record about the impairment and its effect on the claimant is relevant including the opinions of medical and psychological consultants designated by the Commissioner. 20 C.F.R. § 416.926(c). Age, education, and work experience are not considered. *Id.* The fact that the ALJ does not elaborate on his conclusion that the claimant's impairments do not meet or medically equal a listed impairment does not require reversal when the record supports the ALJ's overall conclusion. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

"Listing 12.05(C) is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required." Phillips, at *7 (citing POMS § DI 24515.056). "However, slightly higher IQ's (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and significant work related function may support an equivalence determination." *Id.* at 7. "[G]enerally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found." *Id.* In cases where more than one IQ is customarily derived from the test administered, *e.g.,* where verbal, performance and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with Listing 12.05. *Id.* at 7.

Barber concedes that she did not meet the requirements in Listing 12.05(C), but asserts that the ALJ made no finding on whether the claimant's condition was medically equivalent to the listing. Barber contends that the ALJ's mention of equivalence in a heading is not sufficient to justify a conclusion that the issue has been analyzed or decided in a meaningful way.

In this case, the ALJ mentioned medical equivalence in his conclusory heading, which stated, "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 12.) The ALJ discussed the reasons why Barber's combined severe impairments failed to meet a listing singly and in combination, but medical equivalence is not mentioned.

Using Barber's lowest IQ score, 75, from her most recent WAIS-III combined with Barber's severe impairments of borderline intellectual functioning and depression, there may be support for an equivalence determination. *See Phillips*, at *7. The ALJ acknowledged that Barber's previous IQ scores were in the 60's, but found that there was not significant deficit in

adaptive functioning before the age of 22 based on her school records and activities of daily living.

The undersigned finds that the ALJ did not properly evaluate if Barber's impairments were medically equivalent to the Medical Listing 12.05(C). The ALJ fails to mention that Barber's school records specifically state that "her adaptive behavior is commensurate with her level of functioning." (Tr. 164.) Her level of functioning at that time was "mentally retarded." Next, the ALJ did not discuss the observations and opinions of Barber's vocational counselors or the services Barber currently receives from several agencies including regarding caring for her daughter, obtaining mental health treatment, and performing her daily activities such as shopping and cooking. Lacking discussion of these important factors, the ALJ's decision "fails to sufficiently set forth the evidence that Barber's mental impairments including her IQ do not medically equal Listing 12.05(C). *See Hughes v. Astrue*, 4:11-CV-1566 JCH TCM, 2013 WL 694962 at *17 (E.D. Mo. Jan. 31, 2013) (ALJ's failure to discuss claimant's earlier IQ scores, vocational counselor's observation and opinions fails to set forth evidence that mental impairment did not meet or medically equal Listing 12.05(C)).

## VI. Conclusion

Based on the foregoing, the undersigned recommends that the ALJ's decision be reversed and the case remanded for consideration of whether Barber's IQ scores in combination with her severe impairments are the medical equivalent of Listing 12.05(C), also considering the observations and opinions of the job counselors and the level and types of services she receives for assistance with her activities of daily living.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in her complaint be **GRANTED in part and DENIED in part.** [Doc. 1]; [Doc. 15]

**IT IS FURTHER RECOMMENDED** that this action be remanded to the ALJ to determine medical equivalency under 20 C.F.R.§ 416.920(a).

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 29th day of August, 2013.

/s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE